**Donna M. EVANS, Plaintiff,**

v.

**FORD MOTOR COMPANY, a Delaware Corporation, Defendant.**

**Civ. No. 4–88–914.**

United States District Court, D. Minnesota, Fourth Division.

July 26, 1991.

Michael A. Pinotti, Roseville, Minn., for plaintiff.

James C. Selmer, Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiff Donna Evans brought this action in Minnesota state court against defendants Ford Motor Company (Ford), International Union, United Automobile, Aerospace and Agricultural Implement Workers of America–UAW (the UAW), and United Automobile, Aerospace & Agricultural Implement Workers of America–UAW Local 879 (Local 879) alleging various federal and state law claims relating to her employment with Ford. The action was removed to this court by Ford alleging federal question jurisdiction.

Some claims were subsequently disposed of by summary judgment. On August 6, 1990, the court granted Ford's motion for summary judgment in part, dismissing the claims under 42 U.S.C. § 1981 in count 1, the claims of sexual harassment under 42 U.S.C. §§ 2000e to 2000e–17 (Title VII of the Civil Rights Act of 1964 (Title VII)) and Minn.Stat. §§ 363.01–.15 (the Minnesota Human Rights Act (MHRA)) in count 1, and the claims in counts 2, 3, 4, 5, and 8 (common law fraud, "public policy, retaliatory termination, and outrageous torts," defamation, and conspiracy to defeat Evans' rights). The court also granted the motions for summary judgment of the UAW and Local 879 dismissing all claims against them. The claims remaining for trial at that time were discriminatory and retaliatory discharge under Title VII and the MHRA against Ford.

Trial was held before the court over seven days, with 20 witnesses testifying and 21 exhibits received. On the second day of trial, after considering the parties' motions in limine, the information which had become available to the court, decisions of the Court of Appeals subsequent to the summary judgment order, and the fact that defendant had not shown it would be prejudiced thereby, Evans' claim for sexual harassment under count 1 of her complaint was reinstated. Following trial the parties submitted written arguments and proposed findings of fact and conclusions of law. The court now submits in memorandum form its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), based on its observation of the witnesses and their credibility, and upon review of the exhibits and deposition testimony.

Plaintiff Donna Evans was born February 6, 1958. Her mother was of Irish and German descent, her father of Black and Native American descent. She is an attractive woman of short stature. On July 24, 1976, she married Sydney Barr, Jr, at the age of 18. During this marriage, she worked for short periods at various jobs, including the 3M Company and the Minnesota Public Employees Retirement Fund; at times her husband worked and at times she was supported by Aid to Families with Dependent Children (AFDC). Her marriage to Barr was characterized by physical abuse and ultimately ended in divorce on October 4, 1984. She had two children with Barr, girls who are now age 12 and 14.

Following her divorce, Evans worked at Canteen Company (Canteen) for five months in 1985 as a line-server and cook's helper. Canteen is located inside the Ford Motor Company Twin Cities Assembly Plant (Ford), where it provides food service for Ford employees. She was terminated by Canteen on November 21, 1985. Canteen stated that she was discharged for absenteeism and tardiness; Evans claims that she was discharged for complaining about job conditions.[1] After working at

Canteen, she was employed by Marriott Host at the Twin Cities International Airport as a snack bar attendant for a couple of months at the end of 1985 and the beginning of 1986. After resigning from Marriott Host, she was receiving AFDC until her employment began with Ford.

Evans filled out her application for temporary part-time employment with Ford on April 29, 1987. On this application, she disclosed her prior employment with Canteen, including the fact that she had been discharged. Ford was unable to locate this application in any of its files for this trial. On the day she applied, Evans met with Jerry Ferguson, a labor relations supervisor at Ford. She discussed her work history at Canteen with Ferguson, who told her to come to him if she had problems at Ford. She reported for her first day of work on May 1, 1987, and was assigned front drive-shaft and fuel pump assembly in Chassis Department Zone C. Prior to Evans assuming this job, a white male, Roy Convery, held the position. Evans was told by a co-worker that this was the first time a woman was ever assigned to the job.

In her first week of work, Evans was told by her co-worker Donnie Mitchell, "You've got a nice ass." She told him such comments were inappropriate and complained to her immediate supervisor, Roger Anderson, the Chassis Department Zone C supervisor, who did not take corrective action.

On June 1, 1987, Evans was offered full-time employment with Ford. As per Ford policy, she resigned from her temporary part-time job to take the full-time position and completed a new application form. She filled out the new application at the Department of Labor Relations with the assistance of Colleen McKeown, industrial relations analyst C with Ford. On the application, one question states, "If ever hired by Ford or Subsidiaries, give name of plant and dates." Beneath this on the form is the question, "If ever discharged or asked to resign, state circumstances." Evans asked McKeown if she should include

1. An action was separately brought by Evans against Canteen. *See Evans v. T.W. Services, Inc.,* 930 F.2d 612 (8th Cir.1991) (affirming summary judgment granted to defendant).

her temporary part-time work for Ford in these sections, and was told she should not. Evans then asked if she should fill out the section on past employment again, having included it on her earlier application for temporary part-time employment. McKeown said she did not need to include her past employment on the new application, marked an "X" through that section of the application, and instructed Evans to check the box "No" to the question, "If ever discharged or asked to resign, state circumstances." McKeown told Evans that the new application would be put with her earlier application in her file. Evans followed these instructions. Her full-time job was the same as what she had been doing part-time.

On June 5, 1987, Darrell Lundberg, superintendent of the entire Chassis Department, approached Evans to speak with her. He told her that he had seen her personnel file from Canteen and said, "If you think you can pull that goddamn shit here with me, you'll be out of here." He said Roger Anderson did not know about the Canteen file. Two days after this conversation, Evans spoke with Jerry Ferguson about Lundberg's statement. Ferguson told her that Lundberg should not have had access to her previous employment file with Canteen.

On June 17, 1987, William Skaare of the Ford Labor Relations Department wrote a letter to Dan DuRose of Canteen, requesting Evans' employment records with Canteen for Ford's review. Skaare's letter stated that Evans had authorized the records' release in conjunction with her application for employment with Ford. It also stated that the release authorization was attached, but the authorization was not produced by Ford during discovery or at trial.

At the start of her shift on June 24, 1987, Evans found a hand drawn picture of a female with exaggerated body parts taped to her bench with the words written on it, "This is how you install her parts." She found this offensive and complained to Anderson, who took no remedial action.

Later the same day, Lundberg told Evans that she had been picked to meet a Vice–President of Ford Motor Company. She asked him why she was picked, and Lundberg replied, "So he can fire you for screwing up." Evans asked him if there was a problem with her work, and he replied, "No, but if you keep screwing up there will be." A co-worker, Donnie Mitchell, overheard this conversation and said to Evans, "You were picked so you can serve him [the Vice–President] coffee and tea and sit in his lap." Evans asked Lundberg again why she was picked and Lundberg said, "Because you're so cute." The next day Evans was picked up at her work station in a cart to meet with the Vice–President. As the cart drove past, workers were catcalling and creating a racket by banging on frames and cans, all directed toward the cart. The meeting itself involved about 20 people in a "team concept" talk.

On June 26, 1987, two male co-workers were talking near Evans about "giving blowjobs" to each other. She was offended and complained to Lundberg, who said men don't think before talking. Evans said she needed work protection from such actions. Lundberg replied that it was a male-dominated field and she'd better get used to it.[2]

After a two-week plant-wide shutdown, Evans returned to work on the night shift on July 13, 1987. On July 16, 1987, Evans talked for the first time with Lynn Hinkle, District Committeeman for night shift Chassis Department workers with the United Auto Workers (UAW) Local 879. She

---

**2.** A prior incident at Ford involving Lundberg is of some relevance. In 1986 or 1987, Lundberg was officially reprimanded by Ford Motor Company for an incident involving Lundberg and a black male hourly Ford employee named Carter. Lundberg had told Carter that because he was the person with the least seniority on his shift, he would be the one moved from the day to the night (or number 3) shift. Carter went to his union committeeperson, who found that Carter did not in fact have the least seniority on his shift. When Lundberg learned this, he said to Carter, "You don't have to go to number three. You owe me a blowjob." Carter took offense. Lundberg was reprimanded.

told him about her work-related problems. Hinkle spoke with Anderson about Evans' work-related problems. At trial, Anderson testified that he found Evans to be an acceptable employee. Between this time and Evans' discharge from Ford, Hinkle spoke with Anderson and with Lundberg concerning Evans' complaints about her work and about incidents of harassment.

On July 21, 1987, after pulling a muscle in her neck at work, Evans was temporarily reassigned to janitorial work. Lundberg approached her at her work station to tell her of the reassignment, handing her a broom with the words, "Now you can fly around the plant on your broom, just made sure you don't crash into anything." Shortly thereafter she returned to her usual job. On July 28, she pulled a muscle in her shoulder, exacerbating an injury she had received on July 17 when a truck frame swung, and she was hit in the chest with an axle. Her shoulder became progressively worse, and although she worked with the pain for several weeks, she was finally put on medical restrictions in September.

On August 18, 1987, Evans was assisting co-workers trying to tie down a brake line, when Lundberg walked up and observed them working. He said to Evans, "I get into freaky things and like tying things up." The co-workers all laughed. Later that day, when the line was shutting down and Evans was getting ready to go home, Lundberg was in the area and she asked him whether she could change out of her coveralls and leave for the day. He replied, "Can I come with you to the bathroom and watch you undress?" She said no and waited 20 minutes in the bathroom so he would not be there when she left.

Late in her shift on August 25, 1987, after her last scheduled break for the day, Evans began her monthly period. She asked Roger Anderson for a relief worker to cover her position while she went to the bathroom. He asked why she hadn't gone on her last break and she told him that she had just begun menstruating. Anderson looked at his watch and left the area. No relief arrived. She bled through her cover-

alls, which was seen by a co-worker to her great embarrassment, and could not get to the bathroom until her shift ended. The next day she went to the Labor Relations Department, seeking Jerry Ferguson. She spoke there with William Skaare, telling him about this incident and that she wanted action. Skaare said he would talk with Ferguson about her situation.

On or about September 8, 1987, Evans was at her work station, bending over a box of fuel pumps. Lundberg walked up behind her and while leaning to look over her shoulder pressed his crotch against her rear end. Evans felt something "fleshy and hard" when he did this. Curtis Minter, a co-worker, observed this physical contact by Lundberg. Lundberg asked her how her health was, since she had just returned from four days off with bronchitis. He stated, "You need to get the right kind of exercise." Evans understood this comment to have sexual implications and immediately left the area.

On September 15, 1987, Evans finally went to Dr. Rajput at the Ford Medical Department about her shoulder pain. Dr. Rajput put her on temporary work restrictions and instructed her to get some therapy for her shoulder. Lundberg instructed Anderson to send Evans home from work, which Anderson did. First, however, she went to the Labor Relations Department seeking Ferguson, but found he was not available.

Evans went to work early on September 16, 1987, to meet with Ferguson together with Doug Knight, building chairman for UAW Local 879. Evans, Knight, and Ferguson met in Ferguson's office for about thirty minutes. Evans described her problems at work, including situations of harassment and Anderson's denial of a bathroom break during her period. Ferguson put Evans on medical leave with no more work until her shoulder was healed. She received therapy for her shoulder over the next few weeks. On October 12, she had a physical examination in Ford Medical Department and was told to report the next day to the Labor Relations Department.

On October 13, 1987, Evans went to Labor Relations where she met with Colleen McKeown, David Jacobson (labor relations representative), Doug Knight and Lynn Hinkle. McKeown showed Evans her application dated June 4, 1987, and asked Evans if she had filled out and signed the application. Evans answered that she had. McKeown then informed Evans that she was being terminated for falsifying her employment application because she had not disclosed her prior employment at and discharge from Canteen. Evans asked where the temporary part-time application she had filled out was which disclosed her Canteen discharge, and McKeown said it was lost. Evans asked to see Ferguson, since she had discussed her discharge from Canteen with him, but received no response from McKeown.

■ Subsequent to Evans' discharge, Wayne Johnson, a representative with the Minnesota Department Jobs and Training, contacted McKeown by telephone during his investigation of Evans' application for unemployment compensation. Johnson's written notes of the conversation were contained in Evans' official file kept by the Department of Jobs and Training. According to the notes, McKeown told him:

> It's true that I told her not to write her employment history on her second application, as it was on her first one. (We did lose the first one).... Her attendance and punctuality were satisfactory at Ford, except for her going out on Workers' Compensation for five weeks effective 9/16/87. At that time, her work history was looked at again and management found out from me that she had been fired from Canteen.

According to McKeown, testifying by deposition, she did not instruct Evans to check the "No" box on plaintiff's second application regarding previous discharge in relation to Canteen, but in relation to her formally quitting her temporary part-time position in order to take the full-time position.

However, McKeown admitted marking across the "Previous Employment" section of the application with a large "X" and instructing Evans how to fill out the application with regards to previous employment. Since McKeown told Evans that the new application would be kept with the earlier application, she must have been aware of Evans' prior work history as disclosed on that earlier application. The court finds that Evans did not falsify her June 4, 1987 employment application with Ford.

The court also finds that Ford's proffered explanation for Evans' discharge, falsification, was made with a willful disregard for Evans' rights and the truth. McKeown and Ferguson knew early on about Evans' prior employment and discharge at Canteen. Other personnel at Ford were also aware of her employment at Canteen. Lundberg had told Evans that he had seen her Canteen file. Skaare's letter to DuRose not only shows that Labor Relations knew about her employment at Canteen, but that it possessed Evans' release authorization which was part of her earlier application disclosing the Canteen employment and discharge. Ford has provided no credible explanation for not producing Evans' earlier application. Ford's proffered explanation is not believable in light of the testimony and evidence received at trial. Ford's explanation was a mere pretext attempting to mask the real reasons for terminating Evans. The court finds that Ford fired Evans in retaliation for her protected conduct under Title VII and the MHRA, namely complaining about sexual harassment and sex discrimination on her job.

Evans has experienced significant and understandable mental anguish and suffering as a result of her experiences while working at Ford and in response to her discharge.[3] She has received some counseling to cope with her feelings after termination. Subsequent to her termination at Ford, Evans worked for a time as a day-

---

3. Ford tried to blame Evans' mental anguish and suffering on various misfortunes in her life unrelated to working at Ford. The court finds, however, that her experiences with Ford caused her mental anguish and suffering distinct and separate from that attributable to other experiences in her life.

care provider paid by Ramsey County Welfare. She also worked briefly at ABM Co., and with the Teamsters union; she received AFDC when she was not working. She currently works with the Union of International Electrical Workers as a union organizer.

■ Evans would like reinstatement at Ford, although not in the same position she previously held.[4] In the alternative, she requests four years front pay. She also seeks back pay and seniority dating from the time of her hiring. The court finds that although there has been friction between Evans and certain Ford personnel, it does not rise to the level of special circumstances which would preclude her reinstatement to a position at Ford. The Ford Motor Company Twin Cities Assembly Plant is a large operation with a variety of employment positions and should be able adequately to accommodate Evans' particular abilities and physical limitations with an appropriate position.

Each party presented the testimony of one expert regarding Evans' back pay. The parties agreed that the figures provided by Ford with dollar amounts for lost wages and various benefits are accurate. Dennis Varns, Evans' expert, a Certified Public Accountant testifying as a damages expert for the first time and on short notice, used a method for calculating lost benefits which assumed perfect attendance and continual employment, double-counted certain benefits, relied on admittedly "soft figures" for lost education benefits, and included the cost to Ford of unemployment, workers compensation, and insurance benefits which Evans would not have received under the assumption of perfect attendance and continual employment. Varns also calculated interest at 8% on all the losses he

included. Ford's expert, David D. Jones, Ph.D., an economist who regularly consults regarding litigation, provided more accurate calculations of Evans' lost income which also assumed perfect attendance and continual employment, but did not double-count or erroneously include certain benefits. Jones first calculated Evans' lost Ford income, then deducted the income Evans actually received from October 13, 1987 to April 1, 1991, in mitigation. Jones did not calculate interest on Evans' lost income. Jones calculated Evans' losses, including mitigation, at a total of $146,491. The court finds that Jones has more accurately calculated Evans' losses for the period between her termination and trial, and adopts his figure as a basis by which to determine damages.

In addition to this calculation of Evans' losses without interest, she should receive interest on her losses from the time they accrued at the rate of six percent compounded annually.[5] This comes to an amount of $23,099.

■ In a Title VII action, the plaintiff must carry the initial burden of establishing a prima facie case of discrimination. If the plaintiff establishes a prima facie case the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employment decision in question. If that is done the burden shifts back to the plaintiff to show that the defendant's stated reason was in fact a pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). "Although the burden of production shifts back and forth, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Johnson v.*

---

4. Evans' position in front driveshaft and fuel pump assembly was a physically demanding job, requiring reaching and strength. Her supervisor testified that he found her work performance acceptable. A co-worker testified that he had worked that job for a short time and found it very difficult; he would come back on breaks to watch Evans do her job to see how she could do it. In light of Evans' short stature and the injuries she received while working on that job, her interest in not being reinstated to that

precise job is understandable. She states that she would like reinstatement to a full-time instrument cluster or maintenance job.

5. *See State by Cooper v. Mower County Social Services*, 434 N.W.2d 494, 500–01 (Minn.Ct.App. 1989) (six percent rate of prejudgment interest on compensatory damage award under the MHRA).

*Yellow Freight Sys., Inc.,* 734 F.2d 1304, 1307 (8th Cir.), *cert. denied,* 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984). Evans has not presented direct evidence of discrimination which would bypass the *McDonnell Douglas* burden shifting approach, *see Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985), thus she must establish Ford's discriminatory intent indirectly through the *McDonnell Douglas* formula. The necessary prima facie showing differs for each type of employment decision complained of. *Hervey v. Little Rock,* 787 F.2d 1223, 1231 (8th Cir.1986).

■ To make a prima facie showing of discriminatory discharge, Evans must show that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; and (3) she was discharged. *Johnson v. Yellow Freight, supra,* 734 F.2d at 1307. To make a prima facie showing of retaliatory discharge, Evans must show that: (1) she engaged in activity protected under Title VII and the MHRA; (2) Ford subjected her to an adverse employment action; and (3) Ford's action is causally linked to the protected activity. *Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406, 1411 (9th Cir.1987). The causal link between the protected activity and the adverse employment action may be shown by such temporal proximity between the two as to justify an inference of retaliatory motive. *Figgous v. Allied/Bendix Corp.,* 906 F.2d 360, 362 (8th Cir.1990).

Evans has established a prima facie case of discriminatory and retaliatory discharge. She is a member of a protected class. She was performing her job satisfactorily. She engaged in activity protected by Title VII and the MHRA by repeatedly complaining to Ford management about the harassment she was receiving and requesting remedial action. Her dismissal followed less than one month after a meeting with management at which she made such complaints, sufficiently close in time to show a causal link between her protected actions and her dismissal.

Ford has put forward a non-discriminatory reason for terminating Evans. It contends that she was terminated for falsifying her application for permanent employment with Ford. This showing is sufficient to shift the burden of persuasion back to Evans.

Based on the evidence, the court concludes that Evans has established that Ford's proffered non-discriminatory reason for discharge was a mere pretext for its discriminatory conduct. Ford's discharge of Evans was discriminatory and retaliatory, violating Title VII and the MHRA.

■ To make out a claim of sexual harassment, Evans must show that: (1) she belonged to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) Ford knew or should have known of the harassment. *Moylan v. Maries County,* 792 F.2d 746, 749 (8th Cir.1986); *Klink v. Ramsey County,* 397 N.W.2d 894, 901 (Minn.Ct.App.1986). She must show that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Evidence of isolated incidents generally will not satisfy this burden. *Moylan, supra,* 792 F.2d at 749–50.

■ Evans has established a case of sexual harassment by Ford. She is a member of a protected group. She was subject to repeated unwelcome sexual harassment by Ford management and employees. The harassment was based on sex. The harassment affected the terms, conditions, and privileges of her employment. Ford knew of the harassment because of Evans' repeated complaints and because much of the harassment was carried out by Ford supervisory or management personnel. This was an unusual case of harassment because of the repeated nature of the offensive conduct and the fact that Ford's supervisory personnel participated in the conduct while taking no corrective action regarding the conduct of their subordinates.

Evans is entitled to past economic damages in the amount of $146,491. Under Minn.Stat. 363.071, subd. 2, the court may award compensatory damages for mental anguish and suffering. *State by Cooper v. Moorhead State Univ.*, 455 N.W.2d 79, 84 (Minn.Ct.App.1990); *State by Cooper v. Mower County Social Services*, 434 N.W.2d 494, 499–500 (Minn.Ct.App. 1989). Under the circumstances of this case, the court determines that she should receive $10,000 in compensation for mental anguish and suffering for which defendant is responsible. Under Minn.Stat. § 363.-071, subd. 2, the court has discretion to award compensatory damages in an amount up to three times the actual damages sustained. *See Moorhead State Univ., supra*, 455 N.W.2d at 84; *Convent of the Visitation School v. Continental Casualty Co.*, 707 F.Supp. 412, 415–16 (D.Minn.1989) (applying Minnesota law). The purpose of multiple damages is to redress the wrongs suffered by the victims of discrimination. *Id.* at 416. They are compensatory in nature. *Id.* Here, the court finds Evans is adequately compensated by the award of back pay, mental anguish and suffering, prejudgment interest, and an order reinstating her at Ford. The compensatory damages should not be multiplied.

The court determines that Evans is entitled to prejudgment interest on her past economic damages in the amount of $23,099. *See State by Cooper v. Mower County Social Services*, 434 N.W.2d 494, 500–01 (Minn.Ct.App.1989).

Punitive damages may be awarded under the MHRA pursuant to Minn.Stat. § 549.20. *See* Minn.Stat. § 363.-071, subd. 2. Punitive damages are allowed only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others. They are measured by several factors including the duration of the misconduct, any concealment of it, and the attitude and conduct of the defendant upon discovery of the misconduct. *See Mower County Social Services, supra*, 434 N.W.2d at 500. The MHRA as in effect at the time of the actions Evans has complained of set the maximum amount of punitive damages at $6,000. Under the circumstances of this case, where Evans was subjected to repeated sexual harassment by her co-workers and by her supervisors, where management took no remedial action in the face of her repeated complaints but instead fired her, and where Ford's proffered explanation for her discharge, falsification, was made with a willful disregard for Evans' rights and the truth, the court determines that the statutory maximum of $6,000 in punitive damages should be awarded Evans against Ford.

Judgment should be entered in favor of Evans and against Ford in the total amount of $185,590. Evans is entitled to reasonable attorney fees and costs as the prevailing party, pursuant to 42 U.S.C. § 2000e–5(k), upon her subsequent application under Local Rule 54.3.

Evans is entitled to full reinstatement to a full-time employment position at the Ford Motor Company Twin Cities Assembly Plant. Reinstatement is the ordinary remedy for Title VII violations. Special circumstances may justify its denial, but a court can only deny reinstatement for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1138–39 (8th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981). In this case, there are no special circumstances which would justify denial of reinstatement. Evans is entitled to be reinstated to a position comparable to the one she was denied due to Ford's discrimination, *Briseno v. Central Technical Community College Area*, 739 F.2d 344, 348 (8th Cir.1984), with rights of seniority effective from June 4, 1987, *see Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 163 (5th Cir.1971). Upon reinstatement, the Ford Motor Company Twin Cities Assembly Plant should accommodate Evans' particular abilities and physical limi-

tations with an appropriate position. Ford should not retaliate against Evans for her prosecution of this action against it.

## ORDER FOR JUDGMENT

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Judgment be entered in favor of plaintiff Donna M. Evans and against defendant Ford Motor Company in the amount of $185,590.

2. Within 45 days of this order, defendant Ford Motor Company shall reinstate plaintiff Donna M. Evans to a full-time employment position at its Twin Cities Assembly Plant comparable to her position at termination, with full seniority rights dating from June 4, 1987.

3. Defendant Ford Motor Company shall post this decision in a conspicuous place at its Twin Cities Assembly Plant for the first 45 days of plaintiff's reinstated employment.

4. Defendant Ford Motor Company, including its officers, agents, employees, and attorneys, is permanently enjoined from retaliating against plaintiff Donna M. Evans for prosecuting this action.

LET JUDGMENT BE ENTERED ACCORDINGLY.