**Carmen M. LAFFEY, Plaintiff,**

v.

**INDEPENDENT SCHOOL DISTRICT # 625, Defendant.**

**Civ. No. 3–90–290.**

United States District Court,
D. Minnesota,
Third Division.

July 28, 1992.

Leonard, Street and Deinard by James
Roth and Steve Belton, Minneapolis, Minn.,
for plaintiff.

Popham, Haik, Schnobrich & Kaufman, Ltd. by Cecilia Michel and John Baker, Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER FOR JUDGMENT

LEBEDOFF, United States Magistrate Judge.

The above-captioned matter came on trial before the Court on June 15–17 & 19, 1992. Pursuant to 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73, the parties consented to have the undersigned United States Magistrate Judge conduct the trial of this case and order the entry of a final judgment. Based upon the evidence adduced at trial and upon all the files, records and proceedings herein, the Court makes these findings of fact and conclusions of law.

### I. FINDINGS OF FACT

The underlying case in this matter centers around Plaintiff's claims of disparate treatment on the basis of race and constructive wrongful discharge. From 1975 to August 12, 1988, Plaintiff Carmen M. Magallon Laffey ("Laffey") served as an instructor at the St. Paul Technical Vocational Institute ("the Institute"), a post-secondary program owned and controlled by Defendant, Independent School District # 625. (Def. Exh. 85–86).

Ms. Laffey has tried to make a good life for herself and her family through education and hard work. She was born in El Paso, Texas, July 16, 1940, and is of Mexican-American ethnicity. In February 1975, after receiving an Associate in Arts degree from the General College of the University of Minnesota, Laffey successfully applied to teach clerical procedures at the Institute. (Def. Exh. 8). In September, 1977, Laffey sought and received a certificated position at the Institute. The application for the position requested information regarding the applicant's experience or talents demonstrating qualifications for a teaching position. Laffey represented that she had 22 years of actual experience in business fields and wrote "I also teach bilingually (Spanish and English)." (Def. Exh. 11). Based on this application, Ms. Laffey was recommended to teach in the Bilingual Program at the Institute. She taught business education courses in the Bilingual Program through the spring of 1985. In Fall, 1985, she became a member of the Business Programs Division at the Institute. (Pl. Exh. 4).

Ms. Laffey filed her first charge of discrimination with the Minnesota Department of Human Rights ("MDHR") on November 18, 1986, after the Sabbatical Leave Committee of the Institute decided not to recommend that Ms. Laffey receive a full sabbatical for the 1986–87 school year. (Pl. Exh. 1). In that charge, she asserted that her race and national origin were factors in denying her a full sabbatical leave. In addition, her November, 1986, charge alleged that she had been subjected to differential terms and conditions of employment, and provided the following list:

1. Denial of teaching assignments.
2. Denial of leave time.
3. Denial of advance notification of lay-offs.
4. Evaluations of job performance prepared using requirements in excess of that applied to other teachers.
5. Omission from departmental meetings, communications, etc.
6. Stated procedures not followed in actions which could be unfavorable to me.

In her second charge of discrimination filed with the MDHR in July, 1989, after her August, 1988, resignation, Ms. Laffey re-alleged those allegations contained in her November, 1986, charge and added that she had been subjected to differential terms and conditions of employment throughout her career at the Institute. In addition, she stated in the July, 1989, charge that "[b]ecause of Respondent's discriminatory treatment of me, I constructively discharged my employment in August, 1988." (See Pl. Exh. 72).

On May 21, 1990, Ms. Laffey commenced this action, alleging violations of the Minnesota Human Rights Act ("MHRA"). See Minn.Stat. § 363 and 42 U.S.C. §§ 1981 and

1983. (The §§ 1981 and 1983 claims have been voluntarily dismissed by Plaintiff with prejudice. (*See* Pl. Statement of the Case, p. 6).) Following the receipt of a right-to-sue letter, her Complaint was amended to include a count under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e. The following paragraphs of the Amended Complaint, in addition to Ms. Laffey's claim at trial for a hostile work environment, state the full scope of the conduct challenged in this action:

8. Defendants have unlawfully discriminated against plaintiff on the basis of race and national origin as follows:

 a. Denial of teaching assignment;

 b. Denial of leave time;

 c. Denial of advance notification of layoffs;

 d. Evaluations of job performance prepare [sic] using requirements in excess of those applied to other teachers;

 e. omission from departmental meetings and communications;

 f. Failure to follow standard procedures;

 g. Denial of sabbatical;

 h. Denial of class schedules; and

 i. Denial of classroom space.

9. Because of the foregoing discriminatory treatment by defendants, plaintiff was constructively discharged from employment on or about August, 1988.

(*See* First Amended Complaint, pp. 2–3).

Defendant objected on a continuing basis, before and during trial, to inclusion of MDHR findings and correspondence related to its investigation in evidence.

The Court will address its remaining findings on a claim-by-claim basis:

*Claim 1: Allegedly Hostile Work Environment*

This claim involves allegedly racist comments by employees of the Institute to Ms. Laffey, over one year prior to Ms. Laffey's first charge of discrimination with the MDHR. (*See* Trans. pp. 24, 29).

Nearly every racial slur alleged was made by one instructor. (*See* Trans. p. 24).

Ms. Laffey testified that if she had any problems she could discuss them with Leon Linden, Assistant Director at the Institute. When she had problems she often discussed them with Mr. Linden. (*See* Trans. p. 37).

The evidence does not show that Defendant subjected Ms. Laffey to a hostile work environment on the basis of her race.

*Claim 2: Allegedly Racist Evaluations Using Requirements in Excess of Those Applied to Others*

This claim involves an evaluation of Ms. Laffey that took place in Spring, 1985, over one year prior to Ms. Laffey's first charge of discrimination with the MDHR. (Def. Exh. 15–16).

The evaluation was conducted by Robert Lauritsen, Director of the Bilingual Program at the Institute, who also conducted an evaluation of Darrel Dewar, another teacher. The evaluation performed on Ms. Laffey and Mr. Dewar were different, but not so substantially different to conclude that the Plaintiff was denied the right to equivalent evaluation procedures. (*See* Trans. pp. 271–273, 453).

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race while conducting an evaluation in Spring, 1985.

*Claim 3: Allegedly Racist Denial of Advance Notification of Layoff*

This claim involves Ms. Laffey's inclusion on a list of people to be laid off in a resolution approved by the Board of Education in April, 1985, over one year prior to Ms. Laffey's first charge of discrimination with the MDHR. (Def. Exh. 17–19).

Inclusion of Ms. Laffey within the list of people to be laid off was rescinded by Defendant's Board of Education within three weeks of the original resolution. As a result, no lay-off took place and, consequently, Ms. Laffey did not need to be notified.

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race by failing to give her advance notification of a rescinded layoff.

*Claim 4: Allegedly Racist Exclusions from Department Meetings and Communications*

This claim involves Ms. Laffey's failure to receive a May 16, 1985, memo from Peggy Kennedy, Business Programs Division Manager, to the Business Programs Division staff about an upcoming staff meeting, over one year prior to Ms. Laffey's first charge of discrimination with the MDHR. (Pl. Exh. 3).

In May, 1985, Robert Lauritsen, Bilingual Training Division Manager, rather than Ms. Kennedy, was Plaintiff's Division Manager. Ms. Laffey became a member of the Business Programs Division in Fall, 1985. The evidence indicates that Ms. Laffey did not directly receive a copy of the memo because she was not yet on the staff of the Business Programs Division. (Def. Exh. 22, 24–25).

Through subsequent communications, Ms. Laffey was invited to attend, was given approval by Mr. Lauritsen to attend, and attended the meeting. Following the meeting, Ms. Kennedy wrote Ms. Laffey to thank her for her contribution at the meeting. (Pl. Exh. 4, 5 and Def. Exh. 25, 26).

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race by excluding her from Business Programs Division communications and meetings.

*Claim 5: Allegedly Racist Teaching Assignments*

Ms. Laffey's teaching assignments reflected her education, experience and interests when she arrived in the Business Programs Division in 1985. Her experience by 1985, was primarily with students with special needs. Her 1977 application and education by 1985 had demonstrated her own interest in teaching minority students and special needs students. (Def. Exh. 6, 11–13).

As a result of her tenure in the Bilingual Program that pre-dated her assignment to the Business Programs Division, Ms. Laffey had more seniority than other instructors in the Business Programs Division. However, neither Ms. Kennedy nor the Institute used seniority as a basis for assigning classes. (*See* Trans. p. 222).

In her last year of employment, Ms. Laffey taught eighteen classes. Although Ms. Laffey complained of not getting to teach the classes she desired to teach, seven were classes that she stated, in writing, she would like to teach. Four were classes she stated, in writing, she would teach if needed. The final seven classes were Beginning Typing. Although she stated, in writing, she did not want to teach certain courses, Beginning Typing was not one of those courses. (Def. Exh. 6, 74–75).

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race in assigning classes.

*Claim 6: Allegedly Racist Denial of Permanent Classroom Space*

Space was not available in the Institute to permit each teacher to have his or her own classroom. As a result, Ms. Laffey and several other teachers shared classrooms. (*See* Trans. pp. 44, 311, 445).

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race by denying Ms. Laffey her own classroom space.

*Claim 7: Allegedly Racist Failure to Follow Student Due Process*

Ms. Laffey was the subject of student complaints and concerns regarding her teaching methods and performance. She contends that Ms. Kennedy should not have considered any of the student complaints or concerns until they had been put in writing and first presented by the student to Ms. Laffey, then to the Student Services Manager, and only then to Ms. Kennedy. This contention is based upon Ms. Laffey's interpretation of a Student Due Process Procedure in force in one form or another during the relevant school years. In addition, Ms. Laffey interprets the Student Due Process Procedure to include "cooling off" periods requiring the student to wait a specified number of days before proceeding to the next step with his or her complaint. (*See* Pl. Prop. Fin. Fact Con. Law, p. 10).

The Student Due Process Procedure merely sets forth what students must do in

order to properly exercise their right to have their complaints heard. The policy does not prohibit school personnel who hear complaints from informally relaying that information to persons in a position to resolve the conflicts. It does not prohibit persons in a position to resolve the conflicts from doing so if the student has failed to abide by a literal interpretation of the policy. Nothing in the Student Due Process Procedure indicates that it is to be the exclusive means by which student/teacher problems can be resolved by school administrators. (Pl. Exh. 14–15). It is Defendant's practice to try to resolve student complaints informally before resorting to the Student Due Process Procedure. (*See* Trans. p. 389).

The Student Due Process Procedure does not provide for "cooling off" periods. The dates set forth in the procedure are dates by which students must take the next step of the procedure, not dates until which they must wait to take the step. (Def. Exh. 14–15).

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race by failing to follow the Student Due Process Procedure.

*Claim 8: Allegedly Racist Failure to Receive Personal Leave of Absence to Visit Mexico in February, 1986*

On February 7, 1986, Ms. Laffey asked the Director of Personnel, Dr. James Sargent, for a one-week leave of absence for a vacation with her daughter from February 24 to February 28, 1986. Ms. Laffey was teaching nine courses during that semester. On February 12, 1986, Dr. Sargent denied the request, stating "I appreciate your desire to accompany your daughter but we believe your first obligation is to your students and your contract with the St. Paul public schools." (Pl. Exh. 27–28).

Other teachers were similarly denied personal leaves of absence. (*See* Trans. p. 437).

Evidence was offered that some teachers were granted leaves of absence. However, they were not similarly situated to Ms. Laffey because their requests were based on leaves for educational purposes related

to their work at the Institute or other extraordinary circumstances. (*See* Trans. pp. 263–268). Ms. Laffey was similarly granted a personal leave of absence in Fall, 1986, when it was for educational purposes related to her work at the Institute. (Def. Exh. 50).

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race by denying her a personal leave of absence.

*Claim 9: Allegedly Racist Denial of a Full Sabbatical*

The School District's sabbatical leave policy requires that requests for sabbatical leave commencing in the fall be filed by April 1st of that year. Plaintiff was aware of this policy. (Def. Exh. 117 and *See* Trans. p. 176).

Ms. Laffey applied for the University of Minnesota Master's Program in Business Education in March, 1986, before the April 1st deadline. Ms. Laffey was confident that she would be accepted into the Master's Program, but did not apply for a sabbatical until August 18, 1986, several weeks after her admission to the Master's degree program. Her original request sought a sabbatical commencing within one week of the date of the application (i.e. on August 25, 1986). However, in her letter accompanying the request for sabbatical leave, she did not insist upon receiving a full sabbatical, but suggested the option of taking a leave of absence of one quarter until her sabbatical was approved. (Def. Exh. 48 and *See* Trans. pp. 176–177).

Consistent with the option suggested in her August 18, 1986, letter, Ms. Laffey applied for a leave of absence from August 25, 1986, to January 5, 1987. (Def. Exh. 50). After receiving a leave of absence for the fall quarter, she indicated to Defendant that she sought a retroactive sabbatical for the entire period. (Def. Exh. 55).

Members of the Sabbatical Leave Committee considered Ms. Laffey's request for a retroactive sabbatical. On October 21, 1986, Dr. Sargent, Chairman of the Sabbatical Leave Committee, contacted the members of the committee with information re-

garding an instance seven years earlier in which Dr. Paul Collins, a white male teacher, sought a sabbatical in August, 1979, commencing in Fall, 1979. Dr. Collins had received a waiver of the deadline in order to accept a two-year fellowship. However, contemporaneous documentation from the time of Dr. Collins' application indicated that Dr. Collins' leave could not be deferred, and that this fact, along with Dr. Collins' recent and unexpected notice of acceptance, were the reasons for the Sabbatical Leave Committee's earlier waiver of the deadline. The members of the Sabbatical Leave Committee concluded that the Paul Collins decision in 1979 did not warrant a reversal of their earlier decision to recommend that Ms. Laffey's request for a full sabbatical be denied. (Def. Exh. 55–56, 59).

On November 3, 1986, Defendant's Board of Education approved a sabbatical for Ms. Laffey commencing on January 5, 1987. (See Pl. Prop. Fin. Fact and Con. Law, p. 12).

Ms. Laffey was not similarly situated to Dr. Collins. Unlike Dr. Collins, the Plaintiff could have postponed beginning the Master's Program until her sabbatical began, and continued to teach until the winter quarter or some other later time period. Ms. Laffey chose not to do so. Unlike Dr. Collins' fellowship, admission to the Master's Program at the University of Minnesota was not a one-time opportunity that would be lost if Ms. Laffey did not start in Fall, 1986. (See Trans. pp. 177–178).

The evidence does not show that Defendant discriminated against Ms. Laffey on the basis of her race by denying her a retroactive sabbatical.

### Claim 10: Constructive Discharge

Ms. Laffey voluntarily resigned from the Institute on August 12, 1988. On her resignation form, Ms. Laffey wrote that the reason she was leaving was to start an accounting and tax service business in Arizona. (Def. Exh. 85, 86).

However, Ms. Laffey now contends that the real reason for her resignation was due to the discriminatory treatment she received while at the Institute. (See Trans. pp. 451–452).

Ms. Laffey's belief that she was discriminated against may have been a factor in her resignation, but the evidence does not show discrimination by Defendant that would compel a reasonable person to terminate her employment.

### Damages

In September, 1988, Ms. Laffey relocated to Arizona and sought work as an entrepreneur. She printed a brochure and business cards and began work in tax and accounting. She did not succeed in that field. (See Trans. pp. 190–192).

Although Ms. Laffey's work toward her Bachelor's and Master's degrees was in the field of business education and her teaching experience was for post-secondary business school, Ms. Laffey did not seek out post-secondary positions in business schools or business programs for a number of years. She concentrated her job-seeking efforts, without success, on management positions in industry. (See Trans. pp. 192–197).

Ms. Laffey failed to exercise reasonable diligence to secure substantially equivalent employment. By immediately moving out of the only state in which she was certified (Def. Exh. 7), and by purposefully choosing not to become certified and seek out employment in the only field in which she had been certified and professionally educated in Minnesota, Ms. Laffey has not acted as a reasonably diligent person with her experience and education would have acted.

If Ms. Laffey had been successful in this action against Defendant she would be entitled to the following compensatory damages:

a. Past foregone income damages are $19,271 for the second half of the 1988 calendar year. Damages for foregone income from 1989 until the first half of the 1992 calendar year at present value, are annualized teaching income at present value, as shown in Plaintiff Exhibit 2, mitigated by estimated calendar year earnings of $33,667 at present value.

b. Future foregone income damages are annualized teaching income from the second half of the 1992 calendar year until the first half of the 2001 calendar year at present value, as shown in Plaintiff Exhibit 2, mitigated by estimated calendar year earnings of $33,-667 at present value.

c. Past foregone insurance benefits damages are $655 for the second half of the 1988 calendar year. Damages for insurance after 1988, are zero due to mitigation.

d. Foregone retirement benefits damages are $260,945 after mitigating early withdrawal.

(Pl. Exh. 2 and Def. Exh. 122A).

## II. CONCLUSIONS OF LAW

### *Jurisdiction*

The Court has federal question jurisdiction over Plaintiff's Title VII claims. 42 U.S.C. § 2000e–5(f)(3).

The Court has pendent jurisdiction over Plaintiff's claims under the MHRA.

### *Department of Human Rights Findings and Correspondence as Evidence*

■■■ Plaintiff's use of MDHR findings and correspondence related to its investigation are admitted. Administrative findings with respect to claims of racial discrimination are admissible under Fed.R.Evid. 803(8)(C) in a federal trial de novo. *Johnson v. Yellow Freight System, Inc.,* 734 F.2d 1304, 1309 (8th Cir.1984) *(citing Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1961 n. 39, 48 L.Ed.2d 416 (1976)). In *Johnson* the Eighth Circuit noted that "the Supreme Court in *Chandler, supra,* did not limit the discretion of the trial judge to exclude the report 'if sufficient negative factors are present.' Fed. R.Evid. 803(8)(C) (Notes of Advisory Committee on Proposed Rules)." The Eighth Circuit ruled that the trial court did not abuse its discretion in disallowing the administrative findings because of sufficient negative factors present. *Johnson,* 734 F.2d at 1309. In light of the fact that *Johnson* was a jury trial and the present case is a bench trial, the negative factors of

allowing the evidence present in *Johnson* are not present in this case. However, given that Plaintiff has had an opportunity to present the evidence in a trial de novo, the weight given to the findings of the MDHR and the correspondence related to its investigation are given little weight.

### *Treatment of Untimely Claims*

Plaintiff's claims of discrimination occurring prior to January 22, 1986, are barred as untimely under Title VII if unrelated to a violation occurring in the statutory period. *See* 42 U.S.C. § 2000e–5(e). Similarly, Plaintiff's claims of discrimination occurring prior to November 18, 1985, are barred as untimely under the MHRA. *See* Minn. Stat. § 363.06 subd. 3 (1986).

■■■ There is no redress for unlawful discriminatory acts which took place in a period prior to the statutory period unless the continuing violation theory applies. This theory only applies to acts which are related to violative acts which occurred within the statutory period. *Johnson v. Ramsey County,* 424 N.W.2d 800, 810 (Minn.Ct.App.1988). Plaintiff must establish that the alleged discriminatory acts were either (1) "a series of related acts", or (2) part of "the maintenance of a discriminatory system" by the defendant. *Wingfield v. United Technologies Corp.,* 678 F.Supp. 973, 979 (D.Conn.1988) *(citing Miller v. IT & T,* 755 F.2d 20, 25 (2d Cir.) *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)).

■■■ To satisfy "a series of related acts" test it must be clear that the acts complained of are not completed, distinct occurrences. *Wingfield,* 678 F.Supp. at 979. Plaintiff's claim of an allegedly hostile work environment created by her co-workers due to their derogatory comments toward her race are not related, as a series of acts, to alleged acts within the statute of limitations period. Similarly, Plaintiff's claims regarding the following are not related, as a series of acts, to alleged acts within the statutory period: (1) her May, 1985, teacher evaluation; (2) her failure to receive notification of her April, 1985, re-

scinded layoff; (3) and her failure to be included in Business Programs Division meetings and communications. Although Plaintiff's claims regarding derogatory comments toward her race may be a series of related acts, the Plaintiff's own testimony places all the derogatory comments before the statute of limitations period.

However, claims prior to the statute of limitations period regarding (1) teaching assignments, (2) permanent classroom space, and (3) failure to follow standard procedures with student complaints, satisfy the continuing violation theory if alleged acts within the statute of limitations period, dealing with similar claims, respectively, are violative acts because the claims satisfy "a series of related acts" test.

As to acts which are not a related series, they may satisfy the continuing violation theory if there is a discriminatory system. In order to show that Defendant's acts were part of "the maintenance of a discriminatory system," Plaintiff must show that discrimination was standard operating procedure rather than merely an unusual occurrence. *Id.* Since the evidence does not establish the existence of a system of discrimination by the Defendant, no claims satisfy "the maintenance of a discriminatory system test."

*Claim 1: Allegedly Hostile Work Environment*

If an issue is not raised in the pleadings but is tried with the express or implied consent of the parties, it is treated as if the issue was raised in the pleadings. *Missouri Housing Development Commission v. Brice*, 919 F.2d 1306, 1315–16 (8th Cir.1990) (*citing* Fed.R.Civ.P. 15(b)). Plaintiff raised an issue at trial about a claim of an allegedly hostile work environment created by her co-workers due to their derogatory comments toward her race. Defendant expressly noted that it would not consent to the issue being raised at trial. Plaintiff claims that Defendant impliedly consented to the issue being raised at trial because of the Defendant served a discovery request related to the issue. However, the Eighth Circuit held in *Missouri* that

discovery inquiries do not amount to implied consent to the amendment of a pleading. Because the parties did not address the issue in their Proposed Findings of Fact and Conclusions of Law less than two weeks before trial, they obviously did not believe the issue had entered the case. There can be no redress for Plaintiff on her claim of an allegedly hostile work environment created by her co-workers due to their derogatory comments toward her race because it was not raised in the pleadings.

Plaintiff's claim of an allegedly hostile work environment created by her co-workers due to their derogatory comments toward her race is not pervasive enough to amount to a violation of Title VII or the MHRA. A plaintiff must be subjected to a "steady barrage of opprobrious racial comment." *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981). The Eighth Circuit held that the racial slurs in *Johnson* "were largely the result of individual attitudes and relationships which, while not to be condoned, simply do not amount to violations of Title VII." *Johnson*, 646 F.2d at 1257. Similarly, in the present case, nearly every racial slur alleged by Plaintiff was made by one instructor from a different department. Plaintiff has not proven a pervasive racist environment by her co-workers because of racial slurs.

An employer is not strictly liable under Title VII for an environment created by its employees. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). However, the Supreme Court went on to hold in *Meritor* that "absence of notice to an employer does not necessarily insulate that employer from liability." *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408. The victim in question must have a reasonably available avenue for making his or her complaint known to appropriate management officials when there is a hostile environment created by fellow employees. *Id.* at 71, 106 S.Ct. at 2407–08 (citations omitted). Plaintiff has testified that she was able to bring complaints to a management official. This is a

reasonably available avenue for bringing a discrimination complaint, however, Defendant would be best protected from liability if it had an expressed policy against discrimination and implemented a procedure specifically designed to resolve discrimination claims.

### Analysis of Disparate Treatment Claims

 Plaintiff's claims of discrimination have been pleaded as disparate treatment claims. A disparate treatment discrimination claim is analyzed under the test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this test, the plaintiff has the initial burden of production to establish a prima facie case of discrimination. If the plaintiff has established a prima facie case, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25. The plaintiff, in order to prevail, must successfully rebut the defendant's articulated reason by proving that the proffered reason is pretextual. At all times, the burden of establishing that the plaintiff was subjected to intentional discrimination because of the plaintiff's race rests with the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Minnesota courts have adopted the *McDonnell Douglas* test to analyze disparate treatment claims under the MHRA. *Sigurdson v. Isanti County*, 386 N.W.2d 715, 720 (Minn.1986).

 A prima facie case of discrimination consists of the following elements: (1) the plaintiff belongs to a protected class; (2) the plaintiff applied and was qualified for the job for which the employer was seeking applicants; (3) the plaintiff was rejected; and (4) after the plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The prima facie case articulated in *McDonnell Douglas* will

vary based on differing factual situations. *McDonnell Douglas*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13.

 In order to prove pretext, the plaintiff carries the burden of proof. A "pretext for discrimination" is a fabricated explanation for an action, and not merely a mistake or irregularity; evidence of pretext must persuade the court that the reason proffered by the defendant was not sincerely held by the person who espoused it. *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir.1987), *cert. denied* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

### Claim 2: Allegedly Racist Evaluations Using Requirements in Excess of Those Applied to Others

At trial, Defendant objected to Plaintiff's testimony on redirect about her teacher evaluation and Mr. Dewar's teacher evaluation because it was not rebuttal. (*See* Trans. pp. 452, 453).

Defendant's objection to Plaintiff's testimony on redirect about her teacher evaluation in 1985 is granted because it was not rebuttal. The testimony should have been brought forth on direct examination. However, even if the complaint concerning her evaluation was timely and if Plaintiff's testimony on redirect was allowed, Plaintiff was not a victim of discrimination on the basis of her race by the teacher evaluation.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to establish a prima facie case of discrimination for her claim regarding the evaluation of her job performance. The prima facie case of Plaintiff's allegation of discrimination for the evaluation of her job performance consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff had a right to equivalent evaluation procedures as other teachers; (3) Plaintiff was denied her right to equivalent evaluation procedures; (4) other similarly situated teachers were not denied their right to equivalent evaluation procedures.

■ Plaintiff failed to establish a prima facie case for her claim regarding the evaluation of her job performance. Plaintiff introduced testimony from one other similarly situated teacher. The evaluation performed on the Plaintiff and the similarly situated teacher were different, but not so substantially different to conclude that the Plaintiff was denied the right to equivalent evaluation procedures. However, the Defendant would be best protected from liability if it had an expressed policy describing the evaluation procedure and diligently following the procedure with each teacher.

### Claim 3: Allegedly Racist Denial of Advance Notification of Layoff

Even if Plaintiff's complaint regarding the lack of notice of her layoff was timely, she was not a victim of discrimination on the basis of her race by the lack of notice.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to establish a prima facie case of discrimination for her claim regarding the lack of notice of her layoff. The prima facie case of Plaintiff's allegation of discrimination for the lack of notice consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff had a right to equivalent notice of layoff as other teachers; (3) Plaintiff was denied her right to equivalent notice of layoff; (4) other similarly situated teachers were not denied their right equivalent notice of layoff.

■ Plaintiff failed to establish a prima facie case for her claim regarding the lack of notice of her layoff. Defendant rescinded the Plaintiff's layoff two weeks after the layoff was approved and one month before the layoff was effective. Consequently, Defendant had no reason to notify the Plaintiff and Plaintiff had no right to receive notification that she was being terminated.

### Claim 4: Allegedly Racist Exclusions from Department Meetings and Communications

Even if Plaintiff's complaint regarding exclusion from Business Programs Division meetings and communications was timely, she was not a victim of discrimination on the basis of her race by the exclusion.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to establish a prima facie case of discrimination for her claim regarding exclusion from Business Programs Division meetings and communications. The prima facie case of Plaintiff's allegation of discrimination for the exclusion from Business Programs Division meetings and communications consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff had a right to inclusion in Business Programs Division meetings and communications; (3) Plaintiff was denied her right to inclusion in Business Programs Division meetings and communications; (4) other similarly situated teachers were not denied their right to inclusion in Business Programs Division meetings and communications.

■ Plaintiff failed to establish a prima facie case for her claim regarding exclusion from Business Programs Division meetings and communications. Plaintiff offered evidence that she was excluded from a Business Programs Division communication and meeting in May, 1985. However, the evidence shows that the Plaintiff was not excluded for a discriminatory reason. Plaintiff was excluded because she did not become a member of the Business Programs Division until Fall, 1985. Plaintiff did not have a right to be included.

Even if Plaintiff did establish a prima facie case, Defendant articulated a legitimate, nondiscriminatory reason for excluding Plaintiff. Defendant's division manager understood that Plaintiff would join the Business Programs Division in Fall, 1985. Once the division manager was aware of Plaintiff's desire to attend Business Programs Division meetings, she welcomed her attendance and input. Plaintiff failed to prove that Defendant's reason for excluding her was pretextual.

### Claim 5: Allegedly Racist Teaching Assignments

Plaintiff was not a victim of discrimination on the basis of her race for teaching assignments.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to establish a prima facie case of discrimination for her claim regarding teaching assignments. The prima facie case of Plaintiff's allegation of discrimination for teaching assignments consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff requested and was qualified to teach courses; (3) Plaintiff was denied an opportunity to teach courses she requested; and (4) other similarly situated teachers were given the opportunity to teach courses Plaintiff requested.

██ Plaintiff failed to establish a prima facie case for her claim regarding teaching assignments. Plaintiff was assigned classes she requested to teach. Furthermore, teachers were not similarly situated to Plaintiff because of different educational backgrounds and work experience.

*Claim 6: Allegedly Racist Denial of Permanent Classroom Space*

Plaintiff was not a victim of discrimination on the basis of her race when she was denied permanent classroom space.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to establish a prima facie case of discrimination for her claim regarding the denial of permanent classroom space. The prima facie case of Plaintiff's allegation of discrimination for the denial of permanent classroom space consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff was eligible to receive permanent classroom space; (3) Plaintiff was not provided with permanent classroom space; and (4) other similarly situated teachers were provided with permanent classroom space.

██ Plaintiff failed to establish a prima facie case for her claim regarding the denial of permanent classroom space. Similarly situated teachers, with the same tenure within the Business Programs Division and the same types of course assignments as Plaintiff, were not provided permanent classroom space.

*Claim 7: Allegedly Racist Failure to Follow Student Due Process*

Plaintiff was not a victim of discrimination on the basis of her race when Defendant failed to follow student due process for student complaints against her.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to establish a prima facie case of discrimination for her claim regarding Defendant's failure to follow student due process for student complaints against her. The prima facie case of Plaintiff's allegation of discrimination for failure to follow student due process consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff had a right that Defendant follow student due process for student complaints against Plaintiff; (3) Plaintiff was denied her right that Defendant follow student due process for student complaints against Plaintiff; (4) other similarly situated teachers were granted their right that Defendant use student due process for student complaints against them.

██ Plaintiff failed to establish a prima facie case for her claim regarding Defendant's failure to follow student due process for student complaints against her. Plaintiff did not prove that similarly situated teachers were granted their right that Defendant use student due process. It is Defendant's practice to try to resolve student complaints informally before resorting to student due process. There is no evidence that Plaintiff was treated differently than other teachers with regard to the informal practice. However, the Defendant would be best protected from liability if the student due process allowed for an informal meeting for the student to resolve the complaint.

*Claim 8: Allegedly Racist Failure to Receive Personal Leave of Absence to Visit Mexico in February 1986*

Plaintiff was not a victim of discrimination on the basis of her race by the denial of her request to take a personal leave of absence in February, 1986.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to

establish a prima facie case of discrimination for her claim regarding the denial of a request for a personal leave of absence. The prima facie case of Plaintiff's allegation of discrimination for the denial of her request to take a personal leave of absence consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff sought a personal leave of absence; (3) Plaintiff was denied a personal leave of absence; and (4) other similarly situated teachers were granted personal leaves of absence.

 Plaintiff failed to establish a prima facie case for her claim regarding the denial of a request for a personal leave of absence because she was not similarly situated to teachers who received leaves of absence. Unlike teachers who received such leaves Plaintiff did not agree to use the trip to acquire knowledge related to the subject matter she taught. Also, when Plaintiff made a request for a leave of absence to acquire knowledge related to the subject matter she taught, the request was granted. Furthermore, teachers who were not members of a protected class were similarly denied leaves of absence.

Even if Plaintiff did establish a prima facie case, Defendant articulated legitimate, nondiscriminatory reasons for its decision. Defendant denied Plaintiff's leave of absence because it would have unreasonably interfered with school operations and no exceptional circumstances existed. Plaintiff was teaching a full schedule of classes that semester and she had not arranged coverage for her courses, or offered to arrange such coverage. Plaintiff failed to prove that Defendant's reason for the denial was pretextual.

### Claim 9: Allegedly Racist Denial of a Full Sabbatical

Plaintiff was not a victim of discrimination on the basis of her race by the denial of her untimely request for a sabbatical in Fall, 1986.

Under the *McDonnell Douglas* analysis, Plaintiff has the burden of production to establish a prima facie case of discrimination on her claim regarding the denial of her untimely request for a sabbatical in Fall, 1986. The prima facie case of Plaintiff's allegation of discrimination for the denial consists of the following elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff made an untimely request for a sabbatical; (3) Plaintiff was denied a sabbatical after an untimely request; and (4) other similarly situated teachers were granted a sabbatical after an untimely request.

 Plaintiff failed to establish a prima facie case for her claim regarding the denial of her untimely request for a sabbatical in Fall, 1986, because she was not similarly situated to a teacher who was granted a sabbatical after an untimely request. Plaintiff offered evidence that a white teacher was granted a sabbatical after an untimely request. However, the white teacher was not similarly situated to Plaintiff. The white teacher was a granted a sabbatical because he received an unexpected fellowship that could not be deferred. Plaintiff, however, could have deferred her educational opportunity until the following term and received a full sabbatical.

### Claim 10: Constructive Discharge

 Under Title VII, a constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces the employee to quit the job. *Johnson v. Bunny Bread Company,* 646 F.2d 1250, 1256 (8th Cir.1981). To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit. *Id.* A constructive discharge arises only when a reasonable person would find conditions intolerable. *Id.*

 Under the MHRA, an employer constructively discharges an employee only if it makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *Anderson v. Northwestern National Life Insurance Company,* 480 N.W.2d 363, 367, n. 4 (Minn.Ct.App.1992). The intolerable conditions must be the result of illegal discrimination. *Shea v. Hanna Min. Co.,* 397 N.W.2d 362, 368 (Minn.Ct.App.1986).

There is insufficient evidence to support the allegations that Defendant treated Plaintiff differently based on her race. Therefore, Plaintiff cannot sustain a claim for constructive discharge because she cannot prove that Defendant engaged in any illegal discriminatory treatment of her.

### Damages

Plaintiff is not entitled to back-pay or front-pay, or other compensatory damages because such relief requires proof of a violation of Title VII or the MHRA. Since there is no violation by Defendant, Plaintiff cannot receive relief. If Plaintiff had prevailed compensatory damages would be as set forth in the Findings of Fact.

■■■ If Plaintiff had prevailed, Plaintiff still has a duty to mitigate damages at all relevant times, and therefore must exercise reasonable diligence to secure substantially equivalent employment. If a plaintiff does not make a reasonable effort to secure substantially equivalent employment, the employer need not demonstrate that there were substantially equivalent positions available to plaintiff. *Sellers v. Delgado College*, 902 F.2d 1189 (5th Cir.1990). The facts in the present action show that Plaintiff did not exercise reasonable diligence to find any substantially equivalent positions. Therefore, Defendant does not carry the burden of demonstrating that positions of substantially equivalent employment were available.

■■ Under Title VII, a court, in its discretion, may award attorney's fees to the prevailing party. *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Plaintiff in this action is not entitled to attorney's fees because she cannot prevail on her claim.

■■ The MHRA additionally provides for punitive damages in an amount not to exceed $8,500. Minn.Stat. § 363.071. However, Plaintiff failed to make a motion to amend the pleadings to claim punitive damages as required by Minn.Stat. § 549.-191. *See Zeelan Industries v. deZeeuw*, 706 F.Supp. 702 (D.Minn.1989). Plaintiff's

claim for punitive damages is therefore stricken. In addition, Plaintiff must prove that she is entitled to punitive damages because there is a showing of clear and convincing evidence that the acts of the Defendant were willful indifference to the rights of others. *Evans v. Ford Motor Co.*, 768 F.Supp. 1318, 1327 (D.Minn.1991). Plaintiff failed to prove this. Accordingly, punitive damages can not be granted regardless of whether or not the Plaintiff made a motion to amend the pleadings to include punitive damages.

The MHRA also allows a court to order the defendant to pay a civil penalty to the state's general fund. Minn.Stat. § 363.071. Since there is no violation of the MHRA in this action, Defendant is not required to pay such a penalty to the state.

### III. ORDER FOR JUDGMENT

Based on the foregoing, and upon all the files, records and proceedings herein, the Court hereby finds in favor of Defendant on all counts. Accordingly, this Court ORDERS the following:

1) that Count I of Plaintiff's Complaint alleging violations of the Minnesota Human Rights Act be DISMISSED WITH PREJUDICE;

2) that Count II of Plaintiff's First Amended Complaint alleging violations of 42 U.S.C. § 2000e, et seq., be DISMISSED WITH PREJUDICE;

LET JUDGMENT BE ENTERED ACCORDINGLY.