Sandra SMITH, Plaintiff,

v.

ASHLAND INC., a Kentucky corporation, d/b/a Ashland Petroleum Co., f/k/a Ashland Oil & Refining Company, Defendant.

No. 98–1290 (DWF/AJB).

United States District Court, D. Minnesota.

Feb. 2, 2000.

Beth Bertelson, David J. Schaibley, Bertelson Law Office, Minneapolis, MN, Ann M.I. Mozey, Mozey Law Office, Minneapolis, MN, for Plaintiff.

Marko J. Mrkonich, Ingrid K. Kreuser, Littler Mendelson, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

The above-entitled matter came on for hearing before the undersigned United

States District Judge on January 21, 2000, pursuant to Defendant's Motion for Summary Judgment of all claims and Defendant's Motion to Strike Affidavits. In the Complaint, Plaintiff alleges discrimination based on race and gender, sexual harassment, reprisal, and battery. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted and Defendant's Motion to Strike Affidavits is denied as moot.

## Background

Defendant Ashland Inc. ("Ashland") owns and operates an oil refinery in St. Paul Park, Minnesota. Ashland hired Plaintiff Sandra Smith ("Smith") as a telephone operator on March 2, 1992.

Sharon Freund, who was Office Manager for the St. Paul Park office in 1992, asserts that Jerry Blankenship (part of Ashland's St. Paul Park management team) expressed reluctance about advertising the telephone operator position for fear that " 'if we announce this job in the newspaper [we will] have Blacks and Hmongs and every other kind coming in and applying for this job.' " Aff. of Sharon Freund, ¶ 5. Freund reported Blankenship's comment to Ashland's Kentucky headquarters, and Blankenship was asked to travel to Kentucky. Freund ultimately hired Smith, an African–American woman, for the open position.

From May of 1992 to the fall of 1994, Smith was supervised by Jerry Blankenship and John Roman. During this time, Smith received generally favorable performance reviews and several promotions. In November of 1993, Smith was promoted to the position of "Secretary D," the highest clerical position at the refinery. Smith

asserts, and Ashland does not deny, that Smith did not always receive pay raises in association with her promotions. However, Smith has not offered any evidence that her pay was different from other similarly situated employees.

In December of 1993, Smith decided to apply for one of several "utility worker" positions which were available at the refinery. When Smith expressed interest to John Jordan, the operations superintendent of the refinery and one of the people responsible for the utility worker interviews, he responded with surprise and indicated that he must be a "male chauvinist pig" as it had not occurred to him that one of the secretarial staff might be interested in a utility worker position. Smith reported the comment to Blankenship who informed Jordan that such a comment, whether intended to be discriminatory or not, could be construed as a violation of Ashland's sexual harassment policy. Jordan was replaced as an interviewer with respect to Smith.[1] Furthermore, Jordan was not present when the interviewers discussed Smith and arrived at a consensus on her score. Thus, Jordan had no opportunity to directly influence the score given to Smith or, as a result, her rank in the hiring process. Smith, who was one of nearly 200 applicants for the eight available positions, was not offered a position as a utility worker.

Blankenship suggested to Smith that her opportunity to secure a position as utility worker might be improved if she obtained technical training. Smith determined not to pursue such training.

On several occasions in 1994, John Roman criticized Smith for her work perfor-

---

1. Jordan describes the utility worker hiring process as follows: Each applicant is interviewed by several members of management, each armed with a set of specific questions to ask the applicant. They each score the applicant's responses and then compare their scores. The interviewers must arrive at a consensus for the scores assigned to each applicant. The applicants are then ranked according to their score.

mance with respect to particular tasks. Moreover, Roman was openly critical of Smith's attitude, describing her as having "the worst personality of any employee he[ ] had [had] the pleasure of working with." Smith Dep. at 55.

In the summer and autumn of 1994, Jerry Blankenship and John Roman were replaced by Joe Lake and Jim Nelson. From 1994 until her termination in 1996, Smith's work was supervised by Lake and Nelson.

In 1996, Smith again applied for a position as a utility worker. At that time, Ashland required Smith to undergo aptitude testing as a prerequisite for the position. Smith failed to meet minimum requirements on particular portions of the aptitude test and was not hired as a utility worker. Smith contends that she was at least minimally qualified for the position, but she concedes that she does not know what the minimum test scores were or whether individuals with lower scores were hired.

Smith asserts that the environment at Ashland was sexually charged. Specifically, she claims that male employees frequently made sexual jokes and comments. Smith has submitted. affidavits of several other Ashland employees (both male and female) who describe the environment at Ashland as uncomfortable and sexually charged. There is no evidence in the record, however, to suggest that these employees ever complained about the sexual atmosphere at Ashland.

In addition, Smith alleges that a female Ashland employee named Pam Zeipelt allegedly engaged in frequent sexual banter with the men, often in front of Smith. Smith alleges that Zeipelt was treated more favorably than Smith with respect to tardiness, vacation time, and work load. Smith claims that such favoritism was based on Zeipelt's sexual conversations with male employees and Zeipelt's race.

Another employee, Jeff DeLong, also made frequent sexual remarks in the workplace. At some point after Smith had complained of the sexual banter, DeLong and Smith collided in a hallway. Smith asserts that DeLong bumped into her on purpose and that he did so with his penis. Based upon Smith's deposition, it is unclear how she determined that DeLong bumped into her "with his penis" rather than simply with the lower half of his body; she asserts that the collision caused them to have contact all down the side of her body and that DeLong was fully clothed at the time of the incident. Regardless, Smith never reported the incident to Ashland management.

In 1996, Smith received a very low performance review and was placed on a 90–day probation. Smith asserts that she was held to a different standard because of her race and because she did not engage in sexual repartee. She claims that her superiors were unnecessarily harsh with her and found fault in work which should have been acceptable. Ashland "counseled" Smith on ways to improve her work performance, but Smith continued to maintain that her performance was already acceptable.

Smith was terminated in May of 1996. Smith filed a discrimination charge with the Minnesota Department of Human Rights on April 21, 1997.

### Discussion

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favor-

able to the nonmoving party. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik*, 47 F.3d at 957.

## 2. Race and Gender Discrimination

Smith has asserted that Ashland took adverse employment action against her because of her race and/or gender. Specifically, she asserts that she was denied several promotion opportunities and that she was discharged in a discriminatory fashion.

At the outset, Ashland argues that the majority of Smith's complaints are barred by the statute of limitations. The Court agrees.

■ Under the Minnesota Human Rights Act (MHRA), a claim for discriminatory employment practices must be made within one year of the allegedly discriminatory act. Thus, Smith is entitled to recover only for discriminatory behavior occurring after April 21, 1996–a mere two weeks before her termination. Smith has argued that Ashland's failure to hire her for a position as a utility worker and various decisions regarding Smith's salary, benefits, and workload were all discriminatory. These actions took place outside of the one year window created by Smith's Minnesota Department of Human Rights charge.

■ Smith argues that all of the claimed incidents of discrimination were part of a continuing violation on the part of Ashland. In Minnesota the law is quite clear that individual discriminatory acts which are part of a continuing violation start the time for reporting the entire pattern of discrimination anew with each incident:

> Under that doctrine [the continuing violation doctrine], there may be redress for unlawful discriminatory acts which occurred prior to the statute of limitations period if they are related to violative acts which occurred within the statutory period. A plaintiff may challenge incidents which occurred outside the statute of limitations period if the various acts of discrimination constitute a continuing pattern of discrimination. *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable*, 3 F.3d 281, 285 (8th Cir.1993) (when Title VII violations are continuing in nature, the limitations period does not begin to run until the last occurrence of discrimination); *see also Delaware State College v. Ricks*, 449 U.S. 250, 257–58, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558–60, 97 S.Ct. 1885, 1888–90, 52 L.Ed.2d 571 (1977). Minnesota courts have adopted the continuing violation theory in discrimination cases.

*See Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 441 n. 11 (Minn.1983); *Sigurdson v. Isanti County,* 448 N.W.2d 62, 68 (Minn.1989). Federal courts have recognized two types of continuing violations, a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the limitations period. *Jenson v. Eveleth Taconite Co.,* 824 F.Supp. 847, 877 (D.Minn.1993); *Laffey v. Independent School Dist. No. 625,* 806 F.Supp. 1390, 1400 (D.Minn.1992), *aff'd sub nom.,* 994 F.2d 843, 1993 WL 152716 (8th Cir. 1993), *cert. denied,* 510 U.S. 1054, 114 S.Ct. 715, 126 L.Ed.2d 680 (1994).

*Mandy v. Minnesota Mining,* 940 F.Supp. 1463, at 1468 (D.Minn.1996). The Court finds that, as a matter of law, Smith's claims do not constitute a continuing violation. Rather, Smith has asserted several discrete incidents which she claims were discriminatory. As a result, all of Smith's claims for discrimination other than those directly related to her termination are time-barred.

■ With respect to her claim that Ashland discharged Smith in a discriminatory manner, Smith's claim must fail. Smith has offered no evidence of racial animus or gender bias on the part of the relevant decision-maker.[2] Moreover, in light of Ashland's evidence of a legitimate, non-discriminatory reason for terminating Smith, Smith has failed-as a matter of law-to offer sufficient evidence to support an inference that Ashland's reasons for terminating her were merely pretextual.

### 3. Sexual Harassment Claim

Smith has also asserted that Ashland is responsible for a sexually hostile work environment which it permitted to exist at its St. Paul Park facility. Smith's claim fails for two reasons.

■ First, Smith's claim is barred by the statute of limitations. Ashland's alleged maintenance of a sexually hostile work environment would constitute a continuing violation; thus, Smith need only assert a single incident within the statutory period for her claim to survive. However, Smith has not alleged a single incident of sexual harassment (as distinct from alleged gender discrimination or retaliation) which occurred within the statutory time frame.

■ Even if the Court were to determine that Smith has sufficiently alleged some act or incident of harassment within the statutory period, Smith's allegations do not support an action for sexual harassment. Smith has not asserted that any sexual comments were directed at her; they merely were uttered in her presence. Moreover, the conduct complained of is not sufficiently severe or pervasive to constitute actionable sexual harassment. While the banter at Ashland's St. Paul Park facility may have been tasteless and inappropriate, it was not, as a matter of law, sexual harassment.

**2.** Smith's only evidence of race-based or gender-based animus are the comments made by Blankenship and Jordan. Ashland responded to the Blankenship's racist remark by calling him to the home office. Moreover, despite that remark, Smith was hired for the open position. Finally, Blankenship was responsible for giving Smith a number of glowing performance reviews and a number of promotions. All of the alleged adverse employment actions took place after Blankenship had left the St. Paul Park facility. Similarly, Ashland responded to Jordan's allegedly chauvinistic statement by removing him from the decision-making process with respect to Smith. Given the hiring process employed by Ashland, any bias on the part of Jordan could not have affected Smith's application. Neither Blankenship nor Jordan were involved in the decision to terminate Smith.

### 4. Reprisal and Retaliation

Minnesota Statute § 363.03, subd. 7, forbids an employer from taking any form of retaliation against an employee who "[o]ppose[s] a practice forbidden under [chapter 363] or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter ...." Similarly, 42 U.S.C.A. § 2000e–3 (1998) makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C.A. §§ 2000e–2000e–17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C.A. §§ 2000e–2000e–17]."

Smith has asserted that she was retaliated against because of her complaints about the sexually charged environment at Ashland. As noted above, in the absence of some evidence of a continuing violation, Smith's retaliation claim rises or falls based upon her ability to tie her discharge to the protected activity in which she engaged.

 To establish a *prima facie* claim of reprisal or retaliation, Smith must show that she engaged in some statutorily protected conduct, that some adverse action was taken against her, and that the two are causally linked. *Hubbard v. United Press Intern., Inc.,* 330 N.W.2d 428 (Minn. 1983). Smith has offered no evidence of any causal connection between her complaints and her discharge. Rather, she concedes that she was warned about her performance as early as March of 1994. To suggest that Ashland spent two years laying the groundwork for a retaliatory discharge, absent any supporting evidence,

strains credulity to the breaking point. Smith can in no way demonstrate, given the evidence currently in the record, that Ashland's criticism of her performance and ultimate decision to terminate had anything to do with her complaints.

### 5. Battery

 Smith has asserted a claim against Ashland for battery premised upon an incident in which DeLong (an Ashland employee) bumped into Smith "with his penis." Smith concedes that, to assert a claim against Ashland based upon the actions of DeLong, she must show (1) that Ashland approved of or should reasonably have foreseen the battery and (2) that the battery occurred at a place and during a time related to employment. *Wirig v. Kinney Shoe Corp.,* 448 N.W.2d 526 (Minn. Ct.App.1989). Smith contends that Ashland should reasonably have foreseen the possibility of a battery because Ashland knew that DeLong was "upset" about Smith's complaints and because DeLong had once driven towards Smith in the Ashland parking lot. Such evidence is legally insufficient to support an inference that Ashland should have reasonably foreseen DeLong's violent tendencies.[3]

For the reasons stated, **IT IS HEREBY ORDERED;**

1. Defendant's Motion for Summary Judgment (Doc. No. 29) is **GRANTED** and the **COMPLAINT** is **DISMISSED WITH PREJUDICE.**

2. Defendant's Motion to Strike Affidavits (Doc. No. 32) is **DENIED as MOOT.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

**3.** Assuming, *arguendo,* that the complained of behavior may be considered "violent" as opposed to merely offensive or simply accidental.